# BRAINARD *v.* BUCK.

EQUITY PRACTICE; RESULTING TRUSTS; LACHES.

1. A demurrer to an amended bill in equity upon the ground that it sets up a new and different cause of action from that alleged in the original bill, is properly overruled where the purpose of both the original and the amended bill is to establish a resulting trust in favor of the complainant because of the purchase of property entirely with his money, and although there is some difference between the allegations of the two in respect of the facts relating to the trust, there is no real repugnancy or inconsistency between them. Under such circumstances, the amendment is within the discretion of the lower court.

2. Where in a suit in equity to establish a resulting trust in favor of the complainant in certain real estate, the testimony shows that the property was purchased with the complainant's money placed in the hands of the purchaser, who is dead, as agent or trustee for investment, the complainant will be entitled to a conveyance of the legal title from the heirs at law of the purchaser.

3. Where in a suit in equity to establish a resulting trust in real estate and to enjoin an action of ejectment for its recovery, it appeared that the complainant had been for many years in undisturbed possession of the property and had no reason to believe that his title was not perfect until the institution of the action of ejectment, when he discovered that a will upon which he had relied to make his record title good did not operate to pass after-acquired estate of the testator, it was *held* that the complainant had not been guilty of such *laches* as to bar his right to relief.

No. 972. Submitted June 5, 1900. Decided June 12, 1900.

HEARING on an appeal by the defendants from a decree of the Supreme Court of the District of Columbia, in a suit in equity to establish a resulting trust and to enjoin the prosecution of an action of ejectment. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Hugh T. Taggart, Mr. D. W. Baker* and *Mr. Leo Simmons* for the appellants.

*Mr. Nelson L. Robinson* and *Mr. James Coleman* for the appellees:

Mr. Justice SHEPARD delivered the opinion of the Court:

1. An action of ejectment had been begun in the Supreme Court of the District, by certain heirs at law of Charles F. Brainard, to recover a one-fifth interest in certain lots in the city of Washington, of Leffert L. Buck, who was in possession thereof through his tenant, James Coleman.

Buck filed the original bill in this case April 15, 1898, to enjoin the prosecution of said action, and to compel conveyance of the legal title. He alleged that the property had been purchased by said Charles F. Brainard about July 18, 1879, and paid for in part, at the time, with complainant's money. That complainant was the brother of Mrs. Brainard, and had advanced the money at her and her husband's request in order that she might secure a home for her life. Brainard and wife had no children. He had made a will giving her all of his property, and in case he survived her, the title, which had been executed to him, was to be held in trust for complainant. Complainant's money was used to make the only payments made upon the purchase in Brainard's lifetime, and after the latter's death, he paid the incumbrances securing the remainder.

Brainard died without issue, May 13, 1881, leaving his wife, who made her home upon the premises until her death on March 31, 1892. She made a conveyance to Buck, who suffered her to remain in possession until her death, and contributed to her support. The object of the bill was to set up a resulting trust in complainant, because he had furnished the purchase money.

Such a suit was made necessary, because the will of Brainard, made in June, 1872, on account of the ancient rule of law prevailing in the District of Columbia, did not operate upon the after acquired title. A demurrer was sustained to this bill, and, under leave, complainant filed a

complete amended bill taking the place of the original. This repeated substantially all the allegations of the old bill, but made some changes in that part setting out the facts relied on to show the resulting or constructive trust.

It was alleged that money had been sent to Brainard by Buck for investment, and an itemized statement was given as having been taken from the books of Brainard. That Brainard paid $2,550 of the money sent by Buck for investment, upon the purchase of the property, and took the deed in his own name, without the knowledge, consent or authority of complainant so to do. That afterwards Brainard paid $1,266.66 of complainant's funds upon the balance of purchase money due, and executed a trust deed to secure the residue. That he made further payments on said indebtedness with complainant's money before his death. That upon Brainard's death, his widow and complainant believed that she held the title under his will, and complainant paid the remainder of the purchase money then due and secured by mortgage, namely, $2,000. Thereupon she conveyed to him as aforesaid. It was also alleged that, since the action of ejectment had been instituted, three of the five heirs at law of Brainard had quit-claimed to complainant all their interest, etc.

This amended bill was demurred to, because, among other grounds, it set up a new and different cause of action, and was therefore not proper as an amendment.

The demurrer was overruled, and upon hearing on the evidence, a decree was passed forever enjoining the prosecution of the action at law, and decreeing conveyance by defendants of the legal title to the interest claimed.

2. The purpose of both the original and the amended bill was to establish a resulting trust in favor of the complainant, because of the purchase made entirely with his money; and whilst there is some difference between the allegations of the two, in respect of the facts raising the trust, there is no real repugnancy or inconsistency between

them. The amendment was within the discretion of the court, and the demurrer on the ground stated was properly overruled. *Jones* v. *Van Doren,* 130 U. S. 684, 690.

3. It appears from the evidence that Charles F. Brainard had for years been a clerk in the Treasury Department of the United States. For several years prior to his death, May 13, 1881, he had received a salary of $1,800 per year. His wife was a sister of Leffert L. Buck. They had no children. There is evidence tending to show that Brainard had some little money of his own for investment, which seems to have been lost through the failure of a building and loan association some time before his death.

Leffert L. Buck was a civil engineer and a bachelor. His residence was in the city of New York; but his professional engagements called him to different parts of the world. He testified that he went to Peru in 1875, and before leaving sent about $200 to Brainard for investment. He continued to send sums of money from time to time from 1877 to 1880, and during the latter year. Brainard invested from time to time in bonds which he sold for reinvestment.

Brainard kept an account book which has been preserved, and the entries therein of money received from Buck correspond with a statement rendered to the latter and produced by him in evidence.

Buck testified that he suggested the joint purchase of the house and lot in controversy, which Brainard wrote him could be had for $6,350. Brainard made the purchase at that price on July 18, 1879, making a cash payment thereon of $2,550 with Buck's money, as the account book shows. The remainder was raised by mortgage. The account book, under the same date, shows the charge of the cost of recording the deed, and of insurance, against Buck. The deed was made to Brainard.

Buck testified that early in 1880 he learned that the deed was in the name of Brainard alone, and suggested to

the latter to convey to him and he would pay the balance, and Brainard and wife could occupy the house as a home. Brainard was then in bad health. He did not wish to make the transfer then, saying that when he recovered he would be able to go on and pay the balance on the property, and would also be able to pay for Buck's half, and he thought that better than to go to the expense of making two transfers. He said that, in any event, the property would go to his wife with everything that he had in case of his death. He was sick·and nervous, and Buck did not press the matter. Brainard died of Bright's disease, and was suffering therefrom at the time, though it was not then known.

On March 12, 1880, he paid $1,266.66 on the mortgage with Buck's money in his hands.

Some time after that Brainard made a statement in writing of the cost of the property, showing the payments made with Buck's money, and stating therein that he proposed to convey to Buck a half interest in the property, and to give him his note for the excess paid over one-half. He expected to be able to pay back to Buck this excess and also to finish paying for the property.

Buck testified that he did not agree to this, but let matters run on because of Brainard's nervous condition and because he expected the will of Brainard would invest the legal title in his sister. Brainard died without completing the payment for the property. Mrs. Brainard remained in possession claiming under the will, but conveyed the title to Buck, who paid the last mortgage amounting to nearly $2,000. Mrs. Brainard made her home there until she died on March 31, 1892. Buck was frequently there, and contributed to her support. When she died he leased the property, and has since collected the rents, kept the property in repair, and paid all the taxes.

Without going into further details, it is sufficient to say

that the evidence on behalf of Buck, corroborated on all
material points by the entries in the book of Brainard,
shows clearly that the purchase of the property was made
with his money, in the hands of Brainard for investment;
and that Brainard was his agent and trustee, and not his
debtor for money lent for the purpose. From these facts,
it is clear that a trust resulted in favor of Buck which
entitled him to a conveyance of the legal title.   2|Pom. Eq.,
Sec. 1037.

4. We can not agree with the contention, that complain-
ant has been guilty of such *laches* in asserting his claim to
equitable relief as should bar his right thereto. *Townsend*
v. *Vanderwerker*, 160 U. S. 176, 185, 186; *Ruckman* v. *Cory*,
129 U. S. 387, 389.

In the first of those cases, the plaintiff sued to obtain
specific performance of an oral contract that had been partly
performed. The contracting party had been urged to com-
ply, but, though acknowledging the claim, she continued to
postpone, and died without performance. Plaintiff had
been treated as a child, and lived with her for years; and
she, as a reason for failure to make title, had assured him
that she had provided for him in her will, and that the
property would be his when she was done with it. These
facts were held sufficient to explain plaintiff's delay. The
court said, speaking through Mr. Justice Brown: "The
question of *laches* does not depend, as does the Statute of
Limitations, upon the fact that a certain definite time has
elapsed since the cause of action accrued, but whether, under
all the circumstances of the particular case, plaintiff is
chargeable with a want of due diligence in failing to institute
proceedings before he did."

The circumstances excusatory of delay are much stronger
in this case than in that.

Buck entertained affection for and had perfect confidence
in Brainard. He was anxious to secure a comfortable home

for his sister. Brainard became seriously ill, and his condition was such that Buck would not aggravate it by importunity. Besides, he was assured that Brainard would devise the property to his sister. In fact, Brainard had made, and executed with due formality, a will leaving everything to his wife. This will was then, and until the institution of the action of ejectment, supposed to operate a conveyance of the property in question.

Buck, so believing, took a conveyance from his sister, who was childless, and paid off the last incumbrance. He suffered her to occupy the house until her death. In the meantime, none of the heirs at law of Brainard made any claim to the property. Their apparent acquiescence tended to confirm Buck, who was in actual possession all of the time, in the belief that his title was perfect. There was nothing, therefore, to suggest the necessity or importance of resorting to a court of equity for the confirmation of that title, until the institution of the action of ejectment. When aroused to action, he was diligent in taking it. This long, undisturbed possession, under a title supposed to be perfect, presents a stronger excuse for delay, also, than that held sufficient in *Ruckman* v. *Cory, supra,* wherein it was said: "Nor has the plaintiff been guilty of any such *laches* as would close the doors of a court of equity against him. He was in the peaceful occupancy of the premises for some years prior to any assertion of title upon the part of the defendant under the deed of 1872. If he had not been all the time in the possession of the premises, controlling them as if he were the absolute owner, the question of *laches* might be a more serious one than it is. The bringing of the action of ejectment was, so far as the record shows, the first notice he had of the necessity of legal proceedings for his protection against the legal title held by the defendant. As proceedings to that end were not unreasonably delayed, we do not perceive that *laches* can be imputed to him. *Laches* are

rather imputed to the defendant, who, although claiming to have been the absolute owner of the lands since 1862, took no action against the plaintiff until the ejectment suit was instituted."

The decree appealed from was right, and must be affirmed, with costs.                        .                *Affirmed.*

An appeal to the Supreme Court of the United States was allowed.